## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| DEAN BUTTREY, Derivatively on Behalf of Nominal Defendant LUMINAR TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| AUSTIN RUSSELL, TOM FENNIMORE, ALEC GORES, MARY LOU JEPSEN, SHAUN MAGUIRE, KATHARINE A. MARTIN, DOMINICK SCHIANO, MATTHEW SIMONCINI, DANIEL TEMPESTA, and JUN HONG HENG, | |
| Defendants, | |
| and | |
| LUMINAR TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Dean Buttrey ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Luminar Technologies, Inc. ("Luminar" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal

law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Luminar, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Yskollari v. Luminar Technologies, Inc., et al.,* Case No. 6:25-cv-01384-CEM-NWH (M.D. Fla.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Luminar against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties from at least March 20, 2025, through May 14, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

---

[1] The Individual Defendants are Austin Russell ("Russell"), Tom Fennimore ("Fennimore"), Alec Gores ("Gores"), Mary Lou Jepsen ("Jepsen"), Shaun Maguire ("Maguire"), Katharine A. Martin ("Martin"), Dominick Schiano ("Schiano"), Matthew Simoncini ("Simoncini"), Daniel Tempesta ("Tempesta"), and Jun Hong Heng ("Heng"). "Defendants" means Luminar and the Individual Defendants.

2.      Founded in 2012 by Defendant Russell, Luminar is a technology company that specializes in advanced Light Detection and Ranging ("LiDAR") hardware and software solutions for vehicles.

3.      LiDAR is a remote sensing technology that uses laser light pulses to measure distances to the Earth's service, which are then used to create detailed 3D models of the environment. LiDAR has many applications including helping automobiles and their drivers' sense and understand surroundings.

4.      In addition to offering sensor hardware, the Company's product portfolio includes semiconductor components of its LiDAR that have utility in adjacent markets, including in-development software capabilities such as perception and high-definition 3D mapping.

5.      Throughout the Relevant Period, the Individual Defendants touted the Company's planned milestones for fiscal year 2025 and anticipated financial results, including increases in revenue. The Company also touted the importance of Defendant Russell to the success of the Company in its public filings throughout the Relevant Period.

6.      However, unbeknownst to investors, the Audit Committee had conducted a Code of Business Conduct and Ethics inquiry into Defendant Russell for undisclosed conduct, which would ultimately lead to his resignation as CEO, President, and Chairman of the Board.

7.    The truth was revealed on May 14, 2025, when, after the market closed, the Company issued a press release (the "May 15 Press Release") announcing that Defendant Russell had resigned as President and CEO of the Company and as Chairman of the Board "following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors." Specifically, the May 15 Press Release stated, in relevant part:

> Luminar Technologies, Inc. (Nasdaq: LAZR), a leading global automotive technology company, today announced that the Luminar Board of Directors (the "Board") has appointed Paul Ricci to the role of CEO to be effective on or about May 21, 2025. . . .
>
> Mr. Ricci's appointment follows the resignation of founder Austin Russell as President and CEO of the company and as the Chairperson of the Board, effective immediately, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors. . . .

8.    On this news, the Company's stock price fell $0.80 per share, or approximately 16.8%, to close at $3.96 per share on May 15, 2025

9.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (i) Defendant Russell was engaged in undisclosed conduct that would make him the subject of an inquiry by the Audit Committee; (ii) the undisclosed conduct created a material risk that Defendant Russell would be released from his executive positions

at the Company; (iii) the Company's loss of Defendant Russell in a leadership position would create the material risk that it would be more difficult for the Company to compete with other market participants, manage research and development ("R&D") activities, and retain existing customers or cultivate new customers; (iv) as a result, the Company's 2025 financial guidance had no reasonable basis; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

10. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Russell and Fennimore in the United States District Court for the Middle District of Florida.

11. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

12. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the Individual Defendants' liability in this derivative action and Defendants' liability in the

Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Luminar's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

14.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act and Securities Act.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Luminar is headquartered in this District, Defendants have received compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

20.    Plaintiff is, and has been at all relevant times, a continuous shareholder of Luminar. Plaintiff is a citizen of North Carolina.

*Nominal Defendant*

21.    Nominal Defendant Luminar is a Delaware corporation with its principal executive offices located at 2603 Discovery Drive, Suite 100, Orlando, Florida 32826.  Luminar's common stock trades on the NASDAQ under the ticker symbol "LAZR."

*Individual Defendants*

22.    Defendant Russell is the founder of Luminar and currently serves as a director of the Company. Russell previously served as President, Chief Executive Officer ("CEO"), and Chairman of the Board of the Company from December 2020 until May 14, 2025. Upon information and belief, Defendant Russell is a citizen of Florida.

23.    Defendant Fennimore has served as Chief Financial Officer of the Company since December 2020. Upon information and belief, Defendant Fennimore is a citizen of California.

24.    Defendant Gores has served as a director of the Company since December 2020. Upon information and belief, Defendant Gores is a citizen of

California.

25.     Defendant Jepsen has served as a director of the Company since February 2021. Jepsen also serves as Chair of the Company's Nominating & ESG Committee and as a member of the Company's Compensation & Human Capital Management Committee (the "Compensation Committee"). Upon information and belief, Defendant Jepsen is a citizen of California.

26.     Defendant Maguire has served as a director of the Company since June 2021. Maguire also serves as a member of the Company's Nominating & ESG Committee. Upon information and belief, Defendant Maguire is a citizen of California.

27.     Defendant Martin has served as a director of the Company since February 2021. Martin also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating & ESG Committee. Upon information and belief, Defendant Martin is a citizen of California.

28.     Defendant Schiano has served as a director of the Company since November 2024. Schiano also serves as a member of the Company's Audit Committee. Upon information and belief, Defendant Schiano is a citizen of Pennsylvania.

29.     Defendant Simoncini has served as a director of the Company since December 2020. Simoncini also serves as a member of the Company's Audit

Committee and the Compensation Committee. Upon information and belief, Defendant Simoncini is a citizen of Michigan.

30.     Defendant Tempesta has served as a director of the Company since August 2022. Tempesta also serves as Chair of the Company's Audit Committee. Upon information and belief, Defendant Tempesta is a citizen of Massachusetts.

31.     Defendant Heng served as a director of the Company from June 2021 until May 14, 2025.[2] During the Relevant Period, Heng also served as a member of the Company's Audit Committee and Compensation Committee. Upon information and belief, Defendant Heng is a citizen of California.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

32.     By reason of their positions as officers and/or directors of Luminar, and because of their ability to control the business and corporate affairs of Luminar, the Individual Defendants owed Luminar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Luminar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Luminar and its shareholders.

---

[2] According to the Form 8-K filed by the Company with the SEC on May 15, 2025, "following the inquiry by the Audit Committee of the Board of Directors [described in the Form 8-K announcing Defendant Russell's resignation on May 14, 2025], Jun Hong Heng, a director of the Company, tendered his resignation, effective immediately."

33.    Each director and officer of the Company owes to Luminar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Luminar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.    To discharge their duties, the officers and directors of Luminar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Luminar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38.    To discharge their duties, the officers and directors of Luminar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Luminar were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to Luminar's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Luminar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Luminar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Luminar's operations would comply with all applicable laws and Luminar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)   Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)  Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39.    Each of the Individual Defendants further owed to Luminar and the shareholders the duty of loyalty requiring that each favor Luminar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Luminar and were at all times acting within the course and scope of such agency.

41.    Because of their advisory, executive, managerial, and directorial positions with Luminar, each of the Individual Defendants had access to adverse, non-public information about the Company.

42.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Luminar.

## **LUMINAR'S CODE OF CONDUCT**

43.     The Company's Code of Conduct begins with an introductory section which states, in relevant part, that:

> Luminar Technologies, Inc. and its subsidiaries, affiliates, and successors (the "Company" or "Luminar") is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations. As part of this commitment, the Company has adopted this Code of Business Conduct and Ethics (the "Code"). The Code is intended to:
>
> - promote honest and ethical conduct, including the ethical handling of conflicts of interest;
>
> - promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
>
> - promote compliance with applicable governmental laws, rules and regulations;
>
> - promote the protection of Company assets, including corporate opportunities and confidential information;
>
> - promote fair dealing practices;
>
> - deter wrongdoing; and
>
> - ensure accountability for adherence to the Code.

44.    The "Introduction" section of the Code of Conduct further states that:

**Scope and Responsibilities**

Luminar is committed to promoting an environment where compliance with applicable laws and regulations is expected and ethical behavior is the norm. ***This Code applies to all directors, officers, and employees of Luminar***. Unless otherwise stated, references to employees in this Code are intended to cover the Company's Board of Directors (the "directors" or the "Board") and all officers, employees, independent contractors and consultants of the Company. All directors, officers and employees of the Company are required to be familiar with this Code, comply with its provisions, and report any suspected violations as described below. Officers, managers, and other supervisors are expected to develop a sense of commitment in employees to the spirit and the letter of the Code. Managers and supervisors are also expected to require all agents, consultants and contractors working with or on behalf of Luminar to conform to the standards set forth herein.

(Emphasis added).

45.    Under a section titled "Honest and Ethical Conduct," the Code of Conduct states, in relevant part:

At Luminar, we promote high standards of integrity by conducting our affairs honestly and ethically. Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her duties.

46.    Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors,

16

this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict. A conflict of interest occurs when an individual's personal interest (or the interest of a family member) interferes with the interests of the Company as a whole. Conflicts of interest also arise when an employee, officer or director (or a family member) receives improper personal benefits as a result of his or her position in the Company.

47.     Under a section titled "Compliance with Laws, Rules and Regulations,"

the Code of Conduct states, in relevant part:

> Employees, officers and directors should strive to comply with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific areas of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. Questions about compliance should be addressed to the Legal Department.
>
> No director, officer or employee may trade in Company securities while in possession of material nonpublic information regarding the Company, except pursuant to an approved 10b5-1 trading plan implemented in accordance with the Company's Insider Trading Policy, nor may any director, officer or employee trade in another company's securities while in possession of material nonpublic information regarding that company. It is against Company policies and illegal for any director, officer or employee to use material nonpublic information regarding the Company or any other company to:
>
> - obtain profit for himself or herself; or
> - directly or indirectly "tip" others who might make an investment decision on the basis of that information.

48.    Under a section titled "Honest and Accurate Disclosures," the Code of

Conduct states, in relevant part:

> The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.
>
> To help ensure the integrity of the Company's records and public disclosure, the Company requires that:
>
> - no entry be made in the Company's books and records that is intentionally false or misleading;
>
> - transactions be supported by appropriate documentation;
>
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;
>
> - employees comply with the Company's system of internal controls and be held accountable for their entries;
>
> - any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
>
> - employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the SEC and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information

necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with the Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

49.    Under a section titled "Conduct of Senior Financial Employees," the

Code of Conduct states, in relevant part:

Luminar's finance department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout the

Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Corporate Controller, and any other persons performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company.

- Avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the Audit Committee, any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. . . .

- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

## **LUMINAR'S AUDIT COMMITTEE CHARTER**

50.    Luminar's Audit Committee Charter states that the purpose of the Audit

Committee is to assist the Board in:

[F]ulfilling its oversight responsibilities with respect to: (i) the integrity of the financial reports and other financial information provided by the Company to its stockholders and others; (ii) the Company's financial policies and procedures and disclosure controls and procedures; (iii) the

Company's system of internal control over financial reporting; (iv) the Company's auditing, accounting and financial reporting processes; (v) the qualifications and independence of the Company's independent registered public accounting firm ("independent accountants"); (vi) the performance of the Company's internal audit function (the "Internal Auditor"); and (vii) the Company's financial and operational risk management (unless delegated to a separate committee of the Board).

51.    In a section titled "Responsibilities and Duties," the Audit Committee

Charter states that the Audit Committee has the following responsibilities and duties:

**Documents/Reports Review**

1.    Review with senior financial management and the independent accountants prior to filing the Company's interim financial information, earnings press release and the financial information contained in the Company's quarterly reports on Form 10-Q, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; and (ii) any management certifications related thereto. The Committee Chair may represent the Committee for purposes of this review.

2.    Review the Company's annual financial statements and any other reports or financial information contained in the Company's Annual Reports on Form 10-K, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; (ii) any management certifications related thereto; and (iii) any certification, report, opinion or review rendered by the independent accountants.

3.    Prepare the report of the Committee required by SEC rules to be included in the Company's proxy statement for each annual meeting.

4.    Review any reports submitted by the independent accountants, including a report, if prepared, relating to: (i) all critical accounting policies and practices used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of

such alternative disclosures and treatments, and the treatment preferred by the independent accountants; and (iii) other material written communications between the independent accountants and management, such as any management letter or schedule of unadjusted differences, and discuss with the independent accountants any critical audit matters arising from the current period audit.

5.     At least annually, obtain and review a report by the independent accountants describing: (i) the independent accountants' internal quality control procedures; (ii) any material issues raised by the most recent internal quality control review, or peer review, of the independent accountants, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, with respect to one or more independent audits carried out by the independent accountants, and any steps taken to address any such issues; and (iii) all relationships between the independent accountants and the Company (to assess the independent accountants' independence).

6.     Review and reassess the adequacy of this Charter at least annually, recommend to the Board appropriate changes to the Charter, and assure that the Charter as may be amended is either (i) posted on the Company's website or (ii) included as an appendix to the annual stockholders' meeting proxy statement at least once every three (3) years.

**Control Processes**

1.     Review with senior financial management and the independent accountants at the completion of the annual audit of the Company's consolidated financial statements and prior to filing of the Annual Report on Form 10-K the following:

2.     The Company's annual consolidated financial statements and related footnotes;

3.     Specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

4.     The independent accountants' audit of the financial

statements and their report thereon;

5.    Any significant changes required in the independent accountants' audit plan;

6.    Any difficulties or disputes with management encountered by the independent accountants during the course of the audit; and

7.    Any additional matters related to the conduct of the audit required to be communicated to the Committee under generally accepted auditing standards, including but not limited to the independent accountants' judgment about such matters as the quality (not just the acceptability) of the Company's accounting practices.

8.    Review with management certain matters relating to the independent accountants and the Internal Auditor on a continuing basis, including: (i) the adequacy and integrity of the Company's system of auditing and accounting procedures; (ii) the Company's financial reporting processes, both internal and external; (iii) the Company's system of internal control over financial reporting; (iv) the Company's disclosure controls and procedures; (v) the disclosure regarding internal control over financial reporting and disclosure controls and procedures required by SEC rules to be contained in the Company's periodic reports; and (vi) the attestations and reports relating to such disclosure.

9.    Review with the independent accountants, management and/or the Internal Auditor the appropriateness of accounting principles followed by the Company, changes in accounting principles and their impact on the financial statements. . . .

**Legal and Ethical Compliance**

1.    Oversee and review periodically with management, legal counsel, the head of Ethics and Compliance, and other experts, as appropriate, the programs and policies of the Company designed to ensure compliance with applicable laws and regulations, including compliance with financial crimes laws and regulations, the Foreign Corrupt Practices Act, foreign anti-corruption laws, and export control regulations, and with the Company's ethical standards, and the results of these compliance efforts. Review, investigate and recommend to the

Board actions the Committee deems appropriate to be taken in connection with any matters pertaining to the integrity of the Company's executive officers (as determined under Rule 16a-1(f) of the Exchange Act), including conflicts of interest and adherence to standards of business conduct, as required by the policies of the Company.

2.      Oversee the ethics and compliance process as a procedure for receiving, retaining and treating complaints or concerns, including confidential and anonymous submissions received by the Company regarding accounting, internal accounting controls, auditing or other matters in compliance with applicable law (including SEC rules).

3.      Review periodically with management, legal counsel and other experts, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements.

4.      Coordinate with the Nominating & ESG Committee and the Compensation & Human Capital Management Committee to oversee the Company's ESG reporting requirements and help set up processes to ensure that ESG disclosures comply with applicable laws, regulations and internal control practices.

**Other Responsibilities**

1.      Oversee and review periodically with management the Company's policies relating to finance, capital expenditures, investment, asset management, information management, and the security of its intellectual and physical assets.

2.      Oversee financial-related risks, including risk assessment, major risk exposures and the steps management has taken to monitor and mitigate those exposures, but excluding the enterprise risks over which other Board committees have oversight responsibility.

## SUBSTANTIVE ALLEGATIONS

*Background*

52.      Luminar is a technology company that specializes in advanced LiDAR

hardware and software solutions for vehicles.

53.    LiDAR is a remote sensing technology that uses laser light pulses to measure distances to the Earth's service, which are then used to create detailed 3D models of the environment. LiDAR has many applications including helping automobiles and their drivers' sense and understand surroundings.

54.    In addition to offering the sensor hardware, the Company's product portfolio includes semiconductor components of its LiDAR that have utility in adjacent markets, including in-development software capabilities such as perception and high-definition 3D mapping.

55.    Luminar was founded in 2012 by Defendant Russell. Following the Company's IPO in 2020, Russell has served as CEO of the Company and as Chairman of the Board. At all relevant times, Defendant Russell has been a fixture of the Company and a key employee.

***Individual Defendants' Materially False and Misleading Statements***

56.    On March 20, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Release"). The 4Q24 Earnings Release reported certain projected business milestones to be achieved by the end of 2025, stating:

**2025 Business Milestones:**

Luminar outlined the following business milestones to be achieved by year-end 2025.

1. **Series Production**: Ramp series production volume at least 3x year-over-year; Drive economies of scale; Launch additional vehicle models.

2. **Next-Generation Technology**: Progress on Luminar Halo milestones in customer development contracts for SOP.

3. **Business Model**: Streamline Luminar's operations with customer transitions to a singular technology platform (Luminar Halo) to drive efficient execution, reduced costs, and accelerated path to profitability.

57.     In connection with the 4Q24 Earnings Release, the Company published a slide deck titled "Q4'24 Business Update," which was published on Luminar's website and filed with the SEC (the "4Q24 Presentation"). Among other things, the 4Q24 Presentation included a slide on financial guidance for 2025, which stated, in relevant part:

**Revenue**

FY'25 Total Revenue Growth of 10% to 20%

- 3x expected increase in LiDAR shipments for series production. . . .

- Assumes FY'25 sensor shipments of 30k-33k versus ~9k in FY'24. . . .

58.     The 4Q24 Presentation also reiterated the Company's 2025 business milestones announced in the 4Q24 Earnings Release. Specifically, the 4Q24 Presentation included the following slide:



59.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Russell reiterated the Company's financial guidance for 2025, stating, in relevant part:

> For 2025, we expect – our full year revenue growth, to be in the range of 10% to 20%. This growth will be almost entirely driven by a greater than three times forecasted increase in our sensors, from approximately 9,000 in 2024, to a range that we're currently forecasting of call it 30,000 to 33,000 this year.

60.     On March 28, 2025, the Company filed its annual report for fiscal year 2024 on a Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K highlighted the importance of Defendant Russell to the Company, stating, in relevant part:

> ***We are highly dependent on the services of Austin Russell, our Founder, President and Chief Executive Officer.***

We are highly dependent on Austin Russell, our Founder, President and Chief Executive Officer. Mr. Russell created our first LiDAR product and he remains deeply involved in all aspects of our business, including product development. The loss of Mr. Russell would adversely affect our business because his loss could make it more difficult to, among other things, compete with other market participants, manage our R&D activities, and retain existing customers or cultivate new ones. Negative public perception of, or negative news related to, Mr. Russell may also adversely affect our brand, relationships with customers, or standing in the industry.

61.     The 2024 10-K also assured investors that the Company and its officers and directors were required to follow Luminar's Code of Conduct, stating, in relevant part:

We have adopted a Code of Business Conduct and Ethics that applies to all of the members of our board of directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

62.     The 2024 10-K was signed by Defendants Russell, Fennimore, Gores, Heng, Jepsen, Maguire, Martin, Schiano, Simoncini, and Tempesta. The 2024 10-K was also accompanied by certifications made by Defendants Russell and Fennimore pursuant to Rules 13a-14(a) and 15(d)-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein they attested to the accuracy of the 2024 10-K.

63.     On May 14, 2025, the Company issued a press release announcing its financial results for the first quarter of 2025 (the "1Q25 Earnings Release"). The

1Q25 Earnings Release highlighted the Company's forthcoming milestones for 2025, stating:

**2025 Overall Company-Level Business Milestones**:

Luminar provided a status update on the following business milestones to be achieved by year-end 2025.

1. **Series Production**: Ramp series production volume at least 3x year-over-year; Drive economies of scale; Launch additional vehicle models.

   - On track. Luminar shipped ~6k LiDARs in Q1'25, up approximately 50% from ~4k in Q4'24, driven entirely by an increase in automotive series production sensor sales. This brings the cumulative production shipments to ~14k.

2. **Next-Generation Technology**: Progress on Luminar Halo milestones in OEM development contracts.

   - On track. Luminar is successfully executing development on its Halo LiDAR product and advancing its work against its OEM contracts.

3. **Business Model:** Streamline Luminar's operations with customer transitions to a singular technology platform to drive efficient execution, reduced costs, and accelerated path to profitability.

   - On track. Today, Luminar announced an updated strategic plan for the company, enabled by a unified product platform developed in collaboration with key OEMs. This drives focused and efficient execution, substantially reduced costs, and accelerated path to profitability. Further, the company outlined its vision for the business beyond Luminar Halo, expanding its use of partners from manufacturing and industrialization to include certain development and testing efforts, and returning to its roots as a cutting-edge technology innovation powerhouse.

30

64.    On the same day, in connection with the 1Q25 Earnings Release, the Company published a slide deck titled "Operating Plan, Go-Forward Strategy & Q1'25 Business Update," which was published on Luminar's website and filed with the SEC (the "1Q25 Presentation"). Among other things, the 1Q25 Presentation included a slide on financial guidance for 2025, which stated, in relevant part:

> **Revenue**
> *Maintained*
> FY'25 Total Revenue Growth of 10% to 20%
>
> - >3x expected increase in LiDAR shipments for series production. . . .
>
> - Still assumes FY'25 sensor shipments of 30k-33k versus ~9k in FY'24. . . .

65.    The 1Q25 Presentation also reiterated the Company's 2025 business milestones announced in the 1Q25 Earnings Release. Specifically, the 1Q25 Presentation included the following slide:



66.    Also on May 14, 2025, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2025 (the "1Q25 Earnings Call"). In the 1Q25 Earnings Call, Defendant Fennimore reiterated that, "[f]or 2025, we continue to expect full year revenue growth in the range of 10% to 20%."

67.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Defendant Russell was engaged in undisclosed conduct that would make him the subject of an inquiry by the Audit Committee; (ii) the undisclosed conduct created a material risk that Defendant Russell would be released from his

executive positions at the Company; (iii) the Company's loss of Defendant Russell in a leadership position would create the material risk that it would be more difficult for the Company to compete with other market participants, manage R&D activities, and retain existing customers or cultivate new customers; (iv) as a result, the Company's 2025 financial guidance had no reasonable basis; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *The Truth is Revealed*

68.    The truth was revealed on May 14, 2025, when after the market closed, and shortly after issuing its 1Q25 Earnings Release, the Company filed a Form 8-K with the SEC announcing that Defendant Russell was resigning from the Company. Specifically, the Form 8-K stated, in relevant part:

> On May 14, 2025, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors (the "Board") of Luminar Technologies, Inc. (the "Company"), Austin Russell resigned as President and Chief Executive Officer of the Company and as Chairperson of the Board, effective immediately. Mr. Russell will remain on the Board and be available to the incoming Chief Executive Officer on transition and technology matters.

69.    Along with the Form 8-K, the Company issued the May 15 Press Release, which stated, in relevant part:

Luminar Technologies, Inc. (Nasdaq: LAZR), a leading global automotive technology company, today announced that the Luminar Board of Directors (the "Board") has appointed Paul Ricci to the role of CEO to be effective on or about May 21, 2025. . . .

Mr. Ricci's appointment follows the resignation of founder Austin Russell as President and CEO of the company and as the Chairperson of the Board, effective immediately, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors. . . .

70. On this news, the Company's stock price fell $0.80 per share, or approximately 16.8%, to close at $3.96 per share on May 15, 2025.

### Post-Relevant Period Events

71. Following this news, analysts began to downgrade Luminar's stock and discuss the implications of Defendant Russell's departure on the financial performance of the Company. For instance, immediately following the news, on May 15, 2025, J.P. Morgan issued a report downgrading Luminar stock from "Overweight" to "Neutral." The report explained, in relevant part:

We are moving to Neutral from Overweight following the announcement of Founder and CEO, Austin Russell, stepping down effective immediately, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of Luminar's Board of Directors. We believe Austin's leadership in technology and his industry reputation were central to the bull thesis for the company (for us and the investors we engage with), and while the company retains a strong talent bench and a robust product portfolio, including a best-in-class and vertically integrated technology stack, the uncertainty surrounding technology leadership, the conversion of commercial negotiations, and the overall long-term roadmap leads us to adopt a more cautious stance, especially in the context of a choppy auto industry backdrop due to tariff uncertainty

72.    Then, on May 21, 2025, BofA Global Research analysts issued a report announcing the termination of coverage of Luminar. The report stated, in relevant part:

**Final investment opinion**

We have had an Underperform rating on LAZR given our view that LAZR will need to raise meaningful additional capital. The recent departure of its CEO and founder, Austin Russell, could also adversely impact its ability to innovate.

73.    On August 12, 2025, the Company issued a press release announcing its financial results for the second quarter of 2025 (the "2Q25 Earnings Release"). The 2Q25 Earnings Release reported that the Company was "revising elements of its FY25 guidance." Specifically, the 2Q25 Earnings Release revealed, among other things, that "FY'25 total revenue of $67 million to $74 million due to lower shipment assumption and lower revenue associated with the winding-down of non-core data contract (down from implied range of $82 million to $90 million previously)."

***Harm to the Company***

74.    As a direct and proximate result of the Individual Defendants' misconduct, Luminar has lost and expended, and will lose and expend, millions of dollars.

75.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and the

Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

76.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

77.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

78.    Individual Defendants' misconduct has also exposed the Company to potential liability relating to civil investigative demands from the federal government.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

80.    Plaintiff will adequately and fairly represent the interests of Luminar and its shareholders in enforcing and prosecuting its rights.

81.    Luminar is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

82.    Plaintiff is a current shareholder of Luminar and was a continuous

shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

83.    A pre-suit demand on the Board of Luminar is futile and, therefore, excused.  At the time this action was commenced, the nine-person Board consisted of Individual Defendants Russell, Gores, Jepsen, Maguire, Martin, Schiano, Simoncini, and Tempesta (the "Director Defendants"), and non-party Paul Ricci ("Ricci," and together with the Director Defendants, the "Directors").  As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

84.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

85.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross

negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

86.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

87.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Luminar, the Director Defendants knew, or should have known, the material facts surrounding Luminar's financial condition and internal control mechanisms.

88.    Defendant Russell is not disinterested or independent. Defendant Rusell is the founder of the Company and served as CEO, President, and Chairman of the Board during the Relevant Period. Defendant Rusell also owns, approximately 52.2% of the voting power of Luminar common stock. Furthermore, Defendant Russell is also named as a defendant in the Securities Class Action, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, as

conceded by the Company in its proxy statement filed on a Schedule 14A with the SEC on June 6, 2025 (the "2025 Proxy"), Defendant Russell is a non-independent director.

89.    Director Ricci is not disinterested or independent. In addition to serving as a director of the Company, Ricci also serves as the current CEO and President of the Company. Thus, as conceded by the Company in the 2025 Proxy, Ricci is a non-independent director.

90.    Moreover, Director Defendants Russell, Gores, Jepsen, Maguire, Martin, Schiano, Simoncini, and Tempesta each signed the 2024 10-K. Accordingly, Defendants Russell, Gores, Jepsen, Maguire, Martin, Schiano, Simoncini, and Tempesta breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

91.    Furthermore, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

92.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director

Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

93.    The Directors have taken no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

94.    Defendants Tempesta, Schiano, and Simoncini (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

95.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of

business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

96.    Accordingly, a pre-suit demand on the Board is futile and excused.

**<u>COUNT I</u>**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

99.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

100.  The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting

the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) Defendant Russell was engaged in undisclosed conduct that would make him the subject of an inquiry by the Audit Committee; (ii) the undisclosed conduct created a material risk that Defendant Russell would be released from his executive positions at the Company; (iii) the Company's loss of Defendant Russell in a leadership position would create the material risk that it would be more difficult for the Company to compete with other market participants, manage R&D activities, and retain existing customers or cultivate new customers; (iv) as a result, the Company's 2025 financial guidance had no reasonable basis; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public

statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

102.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

103.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

104.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

105.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the

Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

106. Plaintiff, on behalf of Luminar, has no adequate remedy at law.

### COUNT II
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

109. Plaintiff on behalf of Luminar has no adequate remedy at law.

### COUNT III
### Against the Individual Defendants for Unjust Enrichment

110. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made,

the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Luminar.

112.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Luminar that was tied to the performance or artificially inflated valuation of Luminar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

113.    Plaintiff, as a shareholder and a representative of Luminar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

114.    Plaintiff on behalf of Luminar has no adequate remedy at law.

## <u>COUNT IV</u>
**Against the Individual Defendants for Waste of Corporate Assets**

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.    It resulted in continuous, connected, and ongoing harm to the Company.

117.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

118.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

119.   Plaintiff, on behalf Luminar, has no adequate remedy at law.

<u>**COUNT V**</u>
**Against Defendants Russell and Fennimore**
**for Contribution Under Sections 10(b) and 21D of the Exchange Act**

120.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.   Luminar and Defendants Russell and Fennimore are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Russell's and Fennimore's willful and/or reckless violations of their obligations as officers and/or directors of Luminar.

122.   Defendants Russell and Fennimore, because of their positions of

control and authority as officers and/or directors of Luminar, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Luminar, including the wrongful acts complained of herein and in the Securities Class Action.

123.   Accordingly, Defendants Russell and Fennimore are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

124.   As such, Luminar is entitled to receive all appropriate contribution or indemnification from Defendants Russell and Fennimore.

125.   Plaintiff, on behalf Luminar, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained

as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: August 21, 2025                    **COOK LAW, P.A.**

By:  */s/ William J. Cook*

**OF COUNSEL:**                           William J. Cook
                                          610 East Zack Street, Suite 505
**RIGRODSKY LAW, P.A.**                   Tampa, FL 33602
Vincent A. Licata                         (813)-489-1001
Leah B. Wihtelin                          wcook@cooklawfla.com
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com                    *Attorneys for Plaintiff*

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com